**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **ROBERT RAVENCAMP, on behalf of himself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MENARD, INC.,**<br><br>**Defendant.** | **Case No. 4:18-cv-00107-BP** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff Robert Ravencamp ("Plaintiff"), on behalf of himself and all other similarly situated consumers in the State of Missouri, for his First Amended Class Action Complaint against Menard, Inc. ("Menards"), states and alleges as follows:

**Nature of the Action**

1.      This lawsuit arises out of Menards' false and deceptive marketing of a rebate program promising consumers an 11% savings on everything purchased from Menards stores during certain periods of time (the "11% Rebate Program" or "Program").

2.      Plaintiff and all Missouri consumers who have purchased items under the falsely and deceptively represented 11% Rebate Program have been deprived of the benefit of the bargain because they did not receive the represented value of the "rebate" promised by Menards. As alleged below, each consumer who purchased items under the Program has suffered ascertainable economic injury due to Menards' unlawful conduct.

3. Menards' conduct in advertising and selling products under the 11% Rebate Program violates the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.*, which prohibits "deception, fraud, . . . false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.1.

4. The MMPA authorizes Plaintiff to bring a class action when such unlawful practices have "caused similar injury to numerous other persons." Mo. Rev. Stat. § 407.025.2. In accordance with the MMPA, Plaintiff seeks certification of a class of all consumers who have purchased products from Menards in the State of Missouri under the 11% Rebate Program at any time from January 4, 2013 to the present (the "Class Period").

5. On behalf of himself and the class members, Plaintiff seeks actual damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs.

## The Parties

6. Plaintiff Robert Ravencamp ("Plaintiff") is a Missouri citizen and resides in Blue Springs, Missouri. As described in further detail below, he made purchases under the 11% Rebate Program in May of 2017 from the Menards store located at 4101 S Little Blue Parkway in Independence, Missouri. He made these purchases for personal, family, and household purposes. Due to the false and deceptive nature of the 11% Rebate Program, Plaintiff did not receive the promised value of the 11% rebate.

7. Defendant Menard, Inc. is a Wisconsin corporation with its principal place of business in Wisconsin. Menards has engaged in the business of retailing consumer products, including home improvement products, in the State of Missouri via retail stores and online, and

advertises those products through various means, including in-store signs and banners, newspaper inserts, television ads, and other advertising materials.

**Jurisdiction and Venue**

8.     This Court's subject matter jurisdiction is invoked by way of removal under the Class Action Fairness Act, 28 § 1332(d), and is based on the allegations contained in the Notice of Removal filed by Menards. Plaintiff reserves his ability to challenge subject matter jurisdiction, and discovery on that issue is ongoing.

9.     Menards is registered with the Missouri Secretary of State to transact business in the State of Missouri. Menards maintains a registered agent for service of process in the State of Missouri. Personal jurisdiction is proper in this Court because Plaintiff's injuries arise out of the business conducted by Menards in the State of Missouri.

10.     Venue is proper in Jackson County, Missouri because Plaintiff made the purchases at issue in this case in that county.

**Factual Allegations**

11.     Menards is a large home improvement retailer with over 300 stores, which are primarily located in the Midwest region of the United States. Menards advertises itself as a "low price leader" in the home improvement industry and uses the 11% Rebate Program to bolster this image with consumers.

**I.     Menards' Advertisement of the 11% Rebate Program**

12.     Menards promotes the 11% Rebate Program as a way for consumers to "save big money at Menards." Advertisements of the 11% Rebate Program say that consumers will receive

an 11% rebate on "everything" purchased at Menards stores while the Program is running, including all regular- and sale-priced items.

13.     The 11% Rebate Program applies only to in-store purchases, and all consumers who visit Menards stores while the Program is running are exposed to a ubiquitous advertising campaign that employs impossible-to-miss, neon-yellow signage in various forms throughout the property (including both outside and inside the store) promising consumers an "11% Rebate on Everything" or "11% Off Everything."

14.     First, consumers are exposed to a row of neon-yellow yard signs at the entrance to the store parking lot that proclaim "11% Rebate on Everything." An example from the Menards store in Independence, Missouri is depicted in the following photograph:



Drivers must pass by these yard signs to enter the parking lot and the store. These yard signs are designed to attract attention and draw consumers into Menards stores. Given the color, number and placement of these yard signs, it is impossible for consumers visiting a Menards store during the 11% Rebate Program to *not* take notice of the signs and the promise of an "11% Rebate on Everything" purchased in the store.

15.     Next, consumers are exposed to a large neon-yellow banner on the outside front wall of the store, next to the store entrance, that again proclaims an "11% Rebate on Everything." The banner from the Menards store in Independence, Missouri is depicted in the following photograph:



All customers must pass by this banner to enter the store. This banner is designed to attract attention and draw consumers into Menards stores. Given the color, size and placement of the banner, it is impossible for consumers visiting a Menards store during the 11% Rebate Program to *not* take notice of the banner and the promise of an "11% Rebate on Everything" purchased in the store.

16.     Inside the store, advertisements of the 11% Rebate Program abound. They come in the form of numerous large neon-yellow banners hanging from the rafters that promise "11% Off Everything"; neon-yellow signs affixed to shelves and item displays throughout store that promise an "11% Rebate on Everything"; and neon-yellow signs attached to pricing signs that promise an "11% Rebate on Everything." Examples of these in-store banners and signs from the Menards store in Independence, Missouri are depicted in the following photographs:











Customers walking through the store are bombarded by these banners and signs, which are designed to attract attention and are so numerous that there is likely not a single sight line on the shopping floor of the store where at least one banner or sign is not visible. Given the color, number and placement of the banners/signs, it is impossible for consumers visiting a Menards store during the 11% Rebate Program to *not* take notice of the banners/signs and the promise of "11% Off Everything" or an "11% Rebate on Everything" purchased in the store.

17.     These in-store advertisements of the 11% Rebate Program are reinforced through other media, including print, internet and television advertisements that generally promote the same "11% Rebate on Everything" and "11% Off Everything" message.

18.     Printed flyers for the 11% Rebate Program make the same promise that consumers will receive an "11% Rebate on Everything" and save "11% Off Everything." For example, the front-page header of the printed flyer for the June 2017 Program is depicted in the following photograph:



19.     The printed flyers reinforce consumer perception of an 11% price savings on items purchased under the 11% Rebate Program by presenting the "final price" of certain advertised items. Examples from the June 2017 flyer are depicted in the following photographs:







20.     The printed flyers show only sale items, but they reflect a calculated discount that would logically apply to all items purchased under the 11% Rebate Program, i.e., a direct 11% reduction of the baseline price (either the "everyday low price" or the "sale price") to arrive at the "final price" of items under the Program.

21.     On information and belief, the same types of advertisements depicted above have been used at all Menards stores in Missouri without material variation to promote the 11% Rebate Program throughout the Class Period.

## II.     Plaintiff's Purchases Under the 11% Rebate Program

22.     Menards runs the 11% Rebate Program periodically. The Program was running between May 14 and May 20, 2017.

23.     Plaintiff made purchases under the 11% Rebate Program from the Menards store in Independence, Missouri on May 14, 2017 and May 16, 2017.

24.     While visiting the Menards store on these dates, Plaintiff saw advertisements of the 11% Rebate Program promising an 11% savings on all items he purchased. He viewed the yard signs described and depicted in Paragraph 14 above; he saw the storefront banner described and depicted in Paragraph 15 above; and he was exposed to in-store signage like that described and depicted in Paragraph 16 above.

25.     Plaintiff has not been able to locate the itemized receipt for his May 14, 2017 purchase, but he has a copy of the Rebate Receipt for that purchase (attached as **Exhibit A**). This receipt demonstrates that the purchase qualified for the 11% Rebate Program. Plaintiff does not recall the specific items that he purchased on that date, but given the rebate amount of $5.01, the total purchase price of the transaction was $45.50 (excluding taxes and fees).

26. A re-printed copy of the itemized receipt for Plaintiff's May 16, 2017 purchase is attached as **Exhibit B**.[1] It shows that Plaintiff purchased two items for a total price of $39.96 (excluding taxes and fees). Although Plaintiff cannot locate a copy of his Rebate Receipt for this purchase, the purchase was eligible for the 11% Rebate Program running at the time and would have resulted in a rebate amount of $4.40.

27. Plaintiff submitted the rebate claims for these purchases via United States Mail, as instructed by Menards. He believes that he submitted the two rebate forms together, and he paid standard postage to mail the rebate materials to the designated address on the rebate forms.

28. Plaintiff believes he received a merchandise credit check and that he redeemed the rebate on a later purchase at a Menards store, but he cannot recall the specific details of the redemption. Plaintiff believes that this information is in the possession of Menards and can be confirmed through discovery.

### III. The False and Deceptive Nature of the 11% Rebate Program

29. The 11% Rebate Program induces consumers to purchase products from Menards stores by making it appear to consumers that the "rebate" will ultimately reduce the price of the items purchased and save consumers money on their purchases. The Federal Trade Commission describes the psychology behind rebate programs: "Rebate offers can be irresistible to consum-

---

[1] The re-printed receipt states that it is "not valid for rebate submissions." This is because the 11% Rebate Program requires an *original* receipt. The statement that the re-printed receipt is "not valid for rebate submissions" should not be mistaken as suggesting that the purchase was not made under the 11% Rebate Program.

Plaintiff was able to re-print the May 16, 2017 receipt from a kiosk at the Menards store in Independence. He believes it was possible to re-print this receipt because the purchase was made with a credit card. Plaintiff also tried to re-print the May 14, 2017 receipt, but was unable to do so. He believes it was not possible to re-print that receipt because the purchase was made with cash.

ers, slashing the price of consumer goods at the time of purchase or promising partial or full re-imbursements after the purchase." Federal Trade Commission, *Consumer Information – Rebates*, available at: https://www.consumer.ftc.gov/articles/0096-rebates.

30.     "Rebate" in the context of a retail sale implies valuable cash back to the purchaser in a way that ultimately reduces the dollar amount that the consumer paid for the rebate-eligible product(s). A "rebate" is commonly understood as a way to directly reduce the price of a purchased item, either through immediate discount at the point of sale or through cash reimbursement in the near future. For example, the Merriam-Webster Dictionary defines "rebate" as "a return of a part of a payment." https://www.merriam-webster.com/dictionary/rebate. Black's Law Dictionary similarly defines "rebate" as "[a] return of part of a payment, serving as a discount or reduction" or "[a]n amount of money that is paid back when someone has overpaid." Black's Law Dictionary (10th ed. 2014). Wikipedia describes a "rebate" as "an amount paid by way of reduction, return, or refund on what has already been paid or contributed" by the consumer. https://en.wikipedia.org/wiki/Rebate_(marketing).

31.     By promising consumers that they will receive an "11% Rebate on Everything" and save "11% Off Everything," Menards promotes the 11% Rebate Program as directly reducing the cost of items purchased at Menards stores by the specified amount (*i.e.*, 11%). Menards' advertisements create the impression that the "rebate" under the 11% Rebate Program is offered in the form of cash or rebate check to effectively reduce the price of the product that was purchased to earn the rebate. This is false and deceptive because the Program does not actually provide a rebate that reduces, returns or refunds any part of the price of the purchased product. The "rebate" provided by Menards is not actually a rebate at all, but is merely a *coupon* good on future

purchases at Menards stores. It does not have the effect of a true rebate in directly reducing the net amount a consumer pays for an item, and it is inherently less valuable than a cash-equivalent reimbursement (*i.e.*, an immediate point-of-sale discount or a rebate check that can be cashed at a bank) because it is non-transferrable, has limited utility and can only be redeemed by making an additional expenditure of money on a future purchase at a Menards store.

32. The advertisements of the 11% Rebate Program also are false and misleading because they do not disclose that consumers must incur the cost of postage to claim the "rebate" by mail. It would be possible for Menards to nullify the cost of postage—and give consumers the full value of the represented 11% rebate—by offering pre-paid rebate forms or mailing envelops (*see* https://pe.usps.com/MailpieceDesign/Index?ViewName=BRMIntroduction) or by allowing rebate submissions via electronic mail. But Menards instead requires consumers to pay the cost of postage themselves, which reduces the net value of the rebate to consumers. This means that the "rebate" provided by Menards does not have the advertised effect of returning to consumers 11% of the price of items they purchased under the 11% Rebate Program.

33. Similar false and deceptive representations of the 11% Rebate Program are found in Menards' internet and television advertisements, which make the same promise that consumers will receive an "11% Rebate on Everything" and save "11% Off Everything" without advising consumers that the "rebate" comes in the form of a coupon for future purchases. The internet and television advertisements also fail to advise consumers that they will bear the cost of postage to claim the "rebate" under the Program.

34. Although the signs and banners described and depicted in Paragraphs 14-16 above include an asterisk and fine print advising consumers to "See Flyer For Details," that reference

is woefully insufficient to neutralize the false and deceptive nature of Menards' overall advertising campaign.

35. The signs and banners do not specify what "flyer" is referenced, or inform consumers where to obtain the flyer. This deprives consumers of a meaningful opportunity to gather information on the 11% Rebate Program.

36. Assuming that the "flyer" referenced on the signs and banners is the printed flyer for the given week (similar to the one depicted in Paragraph 18 above), this still does not resolve the false and deceptive advertising found on the signs and banners because the printed flyer is not readily accessible to consumers and its contents only reinforces the misleading promotion of the 11% Rebate Program.

37. The Menards store in Independence, Missouri demonstrates how the printed flyers are not readily accessible to consumers:

   a. The fine print on the yard signs and storefront banner advising consumers to "See Flyer For Details" is not large enough to be seen, read or understood by consumers driving into the parking lot and walking into the store. The qualifying language on these advertisements does not reasonably advise consumers of the need or opportunity to pick up a copy of the printed flyer upon entering the store.

   b. The printed flyers are located in a rack just inside the store entrance, but consumers are not clearly directed to the rack when they enter the store or otherwise advised to review the flyer before beginning to shop.

c.   A few feet inside the store entrance are a set of metal ballpark-type turnstiles that consumers must pass through to reach the shopping floor. These turnstiles give the impression that consumers have crossed a point-of-no-return and cannot go backwards through the barrier, but must now walk through the shopping floor to leave the store through a separate, dedicated exit.

d.   It is not until consumers reach the shopping floor that they are able to view the in-store signage with the fine print advising consumers to "See Flyer For Details." At this point, however, it is too late for consumers to grab one of the printed flyers just inside the store entrance, which are on the other side of the metal turnstiles that discourage consumers from returning to the store entrance where the rack of printed flyers is located.

e.   The printed flyers are not available to consumers on the shopping floor, and the inability to return to the store entrance to grab a printed flyer effectively eliminates the flyer as a source of information for consumers.

38.   Separating the printed flyer from the general advertisements of the 11% Rebate Program on signs and banners throughout the store is one way in which Menards disguises the false and deceptive nature of its rebate and the misleading promise that consumers will receive an "11% Rebate on Everything" and save "11% Off Everything."

39.   Plaintiff was not aware when he entered the Menards store in May 2017 of the need to review the printed flyer for details about the 11% Rebate Program, and he was not aware of where the printed flyers were located. He did not review the flyer before making his purchases,

but even if he had, the flyer would not cure Menards' false and deceptive advertising of the 11% Rebate Program.

40.    As alleged above, the printed flyers reinforce consumer perception of an 11% price savings on items purchased under the 11% Rebate Program by presenting the "final price" of certain advertised items. The format and presentation of the printed flyers is designed to trick consumers into believing they will receive purchased items at a lower price by emphasizing the illusory "final price" in large, colored text that stands out from the rest of the print.

41.    The printed flyers suggest that each item's "final price" is what the consumer will ultimately pay for the product after claiming the "rebate" under the 11% Rebate Program. In reality, the purported rebate has no bearing on the price paid for the product because it is not provided as a cash-equivalent reimbursement, but comes in the form store credit for future purchases of *other* products from Menards. In other words, the "final price" listed in the Menards advertisements is a false and deceptive marketing ploy because the purchase price of the product will never be discounted or reduced to that amount by a so-called rebate that actually functions as a coupon and can only be used for a different product purchase.

42.    The barely legible fine print in the printed flyers states that consumers will receive a "merchandise credit check" for claims submitted under the 11% Rebate Program. This is also a misleading marketing ploy—the reference to "merchandise credit" suggests a reimbursement for an amount already paid, and use of the word "check" connotes a negotiable instrument that can be cashed or deposited at a bank. The "rebate" provided by Menards is none of these things. To be accurate and not misleading, the printed flyer should have clearly advised consumers that they would receive a "coupon" under the Program, which is a commonly understood term that would

have alerted consumers to the true form of the so-called "rebate." The alternative and euphemistic language used by Menards is designed to further confuse consumers about the nature and character of the "rebate" being offered.

43. The printed flyers obscure the fact that the "rebate" comes in the form of a store-credit coupon that is less useful and less valuable to consumers than cash or rebate check because the coupon is non-transferrable and can only be used for future purchases at Menards stores. The 11% Rebate Program, as described in the printed flyers, deceives and misleads consumers by offering a baited "rebate" that is different from what the advertisements suggest and is worth less to consumers.

44. The printed flyers also fail to advise consumers that they will be required to pay the cost of postage to claim the "rebate," which, as alleged above, reduces the net value of the "rebate" to less than what is advertised and constitutes a separate unlawful act.

45. Similar forms of misrepresentation and deception are found in Menards' internet and television advertisements, which use the same "final price" representations from the printed flyers without sufficiently disclosing the nature of the "rebate" to consumers and fail to advise consumers that they must pay postage to claim the "rebate."

46. The 11% Rebate Program also is designed to discourage and impede consumers from claiming and using their "rebates" because the process to receive the store credit coupon is unjustifiably complex and confusing. In order to receive the coupon, the customer must save the "rebate receipt" printed at the bottom of the original receipt from the cash register. The customer must then go to the customer service desk and find the rebate form that corresponds to the rebate receipt that he or she received from the cashier. The number on the rebate form must match

the number on the rebate receipt, and the numbers on the forms change frequently. The rebate form must be filled out and mailed to the appropriate address along with an original store receipt. There is a short deadline for mailing these documents to the third party administering the rebate program. Different rebate forms have different mailing addresses, and failure to send the form to the correct P.O. Box can result in denial of the rebate. The customer must then wait at least six to eight weeks to receive the store credit coupon. The process is so unwieldy and difficult to manage that several instructional videos have been created by individuals to explain the process of receiving a rebate from Menards. *See, e.g.*, *Menards rebates – kind of like couponing*, YOUTUBE (June 16, 2016), https://www.youtube.com/watch?v=RqnNYLM67lU.

47.    If an original store receipt that includes the "rebate receipt" with the necessary rebate number is lost or damaged, then the consumer will be unable to claim the rebate because reprinted receipts do not include the "rebate receipt." Menards' advertisements of the 11% Rebate Program do not sufficiently advise consumers that an original receipt and "rebate receipt" are required to claim the "rebate." This aspect of the Rebate Program is overly restrictive and punitive, and is designed to prevent consumers from making rebate claims and receiving the advertised benefit of the 11% Rebate Program.

48.    The cumbersome and confusing nature of the 11% Rebate Program is not advertised by Menards and is unknown to consumers when they make their purchases because the rebate forms that explain the process are not available until the purchase transactions are completed and the customers are leaving the store. Only after purchases are made can customers obtain the rebate form from the customer service center.

49.     As one scholarly article explains, the purpose of creating a difficult and unwieldy process like Menards' 11% Rebate Program is to deliberately suppress rebate claims:

> The academic literature and business press support the majority view that the effort and the complexity of the redemption task discourages consumers from redeeming rebate offers (Jolson et al. 1987; McLaughlin 2002; Norr 2000; Shim 2002; Soman 1998; Spencer 2002). Effort and complexity have been shown to lower redemption rates in three ways: (1) by causing consumers to give up before completing the redemption application, (2) by preventing redemption when consumers make simple errors such as discarding the bar code or the sales receipt, and (3) by resulting in rejected redemption requests when consumers fail to follow redemption instructions. Issuing firms understand that increasing the effort required to redeem a rebate results in lower redemption rates. As stated by Federal Trade Commission Director J. Howard Beals, "Some companies are quick to offer attractive rebates, but often make them so difficult to redeem that consumers simply give up" (Shim 2002). As explained by a former marketing consultant, "If you have to take a knife and cut through heavy cardboard to get a bar code, the rates drop precipitously" (Norr 2000).

Tim Silk & Chris Janiszewski, *Managing Mail-In Rebate Promotions* at 14, available at:

http://warrington.ufl.edu/departments/mkt/docs/janiszewski/Rebate.pdf.

50.     Menards' marketing of the 11% Rebate Program is false, deceptive and misleading because it does not accurately state the nature of the "rebate" consumers will receive, does not accurately state the net value of the "rebate," and fails to sufficiently disclose certain elements of the rebate program that are designed to discourage and impede consumers from making rebate claims. The unlawful representations made by Menards regarding its 11% Rebate Program have been uniform and consistent throughout the proposed class period.

51.     In one form or another, every consumer who purchased items under Menards' 11% Rebate Program was exposed to Menards' false and deceptive advertisements promising that consumers would receive an "11% Rebate on Everything" and save "11% Off Everything." It is impossible for any consumer who shopped at a Menards store while the Program was running to

have not seen some variation of the challenged advertisements in the form of yard signs, storefront banners, in-store banners and signs, and/or printed flyers.

52.     Menards' false and deceptive representations of the 11% Rebate Program have caused economic harm to Plaintiff and all Missouri consumers who have purchased items under the Rebate Program by depriving them of the benefit of the bargain. At the time of the respective transactions, each and every consumer (including Plaintiff) had been promised an 11% reduction or reimbursement of the purchase price in the form of a true "rebate," but received only a less valuable and less useful right to claim an 11% *coupon* good only toward a future purchase of other items. The coupon actually offered is worth less than the rebate advertised, and each consumer is entitled to recover this difference in value.

53.     All consumers who purchased items under the 11% Rebate Program were also deprived of the benefit of the advertised bargain because the full value of the promised rebate could never be realized. Consumers are required to pay postage to claim the rebate, which has the effect of reducing the net value of the rebate to an amount less than the advertised 11% savings. This is another reason why the "rebate" offered is worth less than the rebate advertised, and each consumer is entitled to recover this difference in value.

## Class Action Allegations

54.     Plaintiff brings his class action for violation of the MMPA pursuant to Mo. R. Civ. P. 52.08 and Mo. Rev. Stat. § 407.025 on behalf of all consumers who have purchased items at Menards under the 11% Rebate Program in the State of Missouri for personal, family, or household purposes at any time from January 4, 2013 to the present (the "Class"). Excluded from the Class are: (1) Menards, its subsidiaries and affiliates, its directors and officers, and members of

their immediate families; (2) federal, state, and local government entities; and (3) any judicial officers presiding over this action, their staff, and members of their immediate families.

55. Members of the Class are so numerous that their individual joinder herein is impracticable.

56. Common questions of law and fact exist for all Class members. The MMPA claims of Plaintiff and all Class members arise from a common nucleus of operative fact including, but not limited to, questions regarding: (1) the existence of uniform representations about the nature of Menards' 11% Rebate Program; (2) whether those representations are false, deceptive, and misleading; and (3) the existence of uniform economic harm to consumers who purchased products from Menards under the falsely and deceptively marketed 11% Rebate Program. The MMPA claims of Plaintiff and all Class members are linked by the common questions of law regarding the legality of Menards' conduct under the MMPA and the entitlement of Class members to damages under the statute. These common questions of law and fact are amenable to class-wide resolution based on common evidence.

57. Plaintiff's MMPA claim is typical of the claims of the members of the Class as all members of the Class are similarly affected by Menards' unlawful conduct. Plaintiff has no interests that are antagonistic to the interests of other Class members. Plaintiff and all members of the Class have sustained economic injury arising out of the unlawful conduct for which Menards is liable.

58. Plaintiff is a fair and adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent. Plaintiff has retained competent and experienced counsel, who are fair and adequate representatives of the proposed

Class because they will vigorously prosecute this action and do not have any conflicts of interest. The interests of the Class members will be fairly and adequately protected by Plaintiff and his counsel.

59.     Common issues predominate over individual issues in this case because the over-riding issues of liability and damages under the MMPA can be determined on a class-wide basis from common evidence regarding Menards' uniform misconduct and the uniform economic harm to class members who made purchases at Menards under the 11% Rebate Program that has been falsely, deceptively and misleadingly advertised.

60.     Class treatment is the superior method of adjudicating the class members' MMPA claims because it avoids the inefficiencies and inconsistencies of piecemeal litigation and ensures that all class members are given their day in Court. Class treatment is also expressly authorized by the MMPA. *See* Mo. Rev. Stat. § 407.025.2.

<u>**Count I**</u>
**(Violation of the Missouri Merchandising Practices Act)**

61.     Plaintiff incorporates by reference the allegations in all paragraphs of this Petition as though fully set forth in this paragraph.

62.     Plaintiff brings this MMPA claim individually and on behalf of the members of the Class, all of whom made purchases at Menards under the 11% Rebate Program for personal, family, or household purposes.

63.     Items purchased under the 11% Rebate Program are "merchandise" for purposes of the MMPA, which defines "merchandise" as including "any objects, wares, goods, [or] commodities." Mo. Rev. Stat. § 407.010(4).

64.     At all times relevant to this action, Menards has made numerous false, deceptive, and misleading representations about the nature of the "rebate" offered under the 11% Rebate Program. This misconduct is described in detail in paragraphs 29-50 above. Menards' actions constitute unlawful practices under the MMPA, which prohibits the use of misrepresentation, deception and unfair practices in connection with the sale or advertisement of consumer goods. *See* Mo. Rev. Stat. § 407.020.1.

65.     As a direct and proximate result of Menards' unlawful conduct, Plaintiff and all members of the Class suffered an ascertainable loss of money under the benefit of the bargain rule because they did not—and could not—receive the full value of the represented "rebate" at the time of their respective purchases, as described in Paragraphs 52 and 53 above.

WHEREFORE, Plaintiff prays for judgment against Menards and in favor of Plaintiff and the Class for actual damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and costs of suit.

### Stipulation as to the Amount in Controversy

66.     Plaintiff hereby stipulates that the amount in controversy on his *individual claim* does not exceed the sum or value of $75,000, exclusive of interest and costs, as he is not seeking, will not seek, and will not accept any measure of damages on those claims in excess of $75,000. Plaintiff stipulates that in no event will he request or accept an award of *attorneys' fees* in this case that would cause the amount in controversy to exceed the sum or value of $75,000 on his individual claims or the aggregate sum or value of $5,000,000 on the class claims, exclusive of interest and costs. A copy of Plaintiff's affidavit and stipulation to this effect is attached hereto as

**Exhibit C**. This stipulation does not purport to limit the amount of damages to be claimed or recovered by the Class.

67.     The undersigned counsel hereby stipulates that in no event will his firm request or accept an award of ***attorneys' fees*** that would cause the amount in controversy in this case to exceed the sum or value of $75,000 on Plaintiff's individual claim or the aggregate sum or value of $5,000,000 on the class claims, exclusive of interest and costs. A copy of the undersigned counsel's affidavit and stipulation to this effect is attached hereto as **Exhibit D**. This stipulation does not purport to limit the amount of damages to be claimed or recovered by the Class.

## Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all claims so triable.


Respectfully submitted,

SHANK & MOORE, LLC

By:  */s/ Stephen J. Moore*
         Christopher S. Shank          MO #28760
         Stephen J. Moore               MO #59080
         David L. Heinemann           MO #37622
         1968 Shawnee Mission Pkwy, Suite 100
         Mission Woods, Kansas 66205
         Telephone:   816.471.0909
         Facsimile:     816.471.3888
         chris@shankmoore.com
         sjm@shankmoore.com
         davidh@shankmoore.com

         *Attorneys for Plaintiff Robert Ravencamp*

# CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing document was filed this 19th day of April, 2018, via the Court's CM/ECF system, which shall send electronic notice of the same to the following counsel of record:

**Counsel for Defendant Menard, Inc.**
Bryant T. Lamer
Thomas Hiatt
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64106

-and-

Brian P. Norton
James J. Boland
Andrew C. Nordahl
Verona M. Sandberg
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606

*/s/ Stephen J. Moore*
Attorney for Plaintiff