# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT RAVENCAMP, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 18 CV 107-BP |
| MENARD, INC., | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) AND SUGGESTIONS IN SUPPORT

Bryant T. Lamer
Thomas Hiatt
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64106
Tel.     (816) 474-8100
Fax     (816) 474-3216
blamer@spencerfane.com
thiatt@spencerfane.com

Brian P. Norton
James J. Boland
Andrew C. Nordahl
FREEBORN & PETERS LLP
311 South Wacker Dr., Suite 3000
Chicago, Illinois 60606
Tel.     (312) 360-6000
FAX    (312) 360-6520
bnorton@freeborn.com
jboland@freeborn.com
anordahl@freeborn.com

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTS ................................................................................................................. 3

    A.    Menards and Its 11% Rebate Sale .......................................................... 3

    B.    Menards' Store Signs ............................................................................... 4

    C.    Menards' Flyers and the Terms of The 11% Rebate Sale ..................... 6

    D.    Ravencamp Knew The Terms of the 11% Rebate Sale When He Made His Purchases on May 14, 2017, Because He Paid For His Purchases With a Merchandise Credit Check from a Prior 11% Rebate Sale ................................... 8

    E.    After Ravencamp Made His Purchases in May 2017, He Mailed in the Rebate Forms and Rebate Receipts, Obtained a Store Credit and Redeemed It ...................................................................................... 10

III.    ARGUMENT ..................................................................................................... 13

    A.    Menards' Signs Are Not Deceptive .................................................... 15

    B.    Ravencamp Knew The Terms of Menards' 11% Rebate Sale When He Made His Purchases in May 2017 ....................................................... 19

    C.    Ravencamp Suffered No Ascertainable Loss .................................... 20

CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashanti v. City of Golden Valley*,
666 F.3d 1148 (8th Cir. 2012) ...................................................................6

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937 (2009)........................................................13

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................13, 17

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) ....................................................................6

*Chochorowski v. Home Depot U.S.A., Inc.*
295 S.W.3d 194 (Mo. Ct. App. 2009)......................................................14

*Enervations, Inc. v. Minn. Mining & Mfg. Co.*,
380 F.3d 1066 (8th Cir.2004) ....................................................................6

*Grawitch v. Charter Commc'ns, Inc.*,
750 F.3d 956 (8th Cir. 2014) ...................................................................21

*Haywood v. Massage Envy Franchising, LLC*,
887 F.3d 329 (7th Cir. 2018) ...................................................................20

*Hess v. Chase Manhattan Bank, USA, N.A.*,
220 S.W.3d 758 (Mo. 2007) (*en banc*) ...................................................13

*Hughes v. 3M Retiree Medical Plan*,
281 F.3d 786 (8th Cir.2002) ......................................................................6

*Kelly v. Cape Cod Potato Chip Co.*,
81 F. Supp. 3d 754, 761-62 (W.D. Mo. 2015).........................................17

*Kushner v. Beverly Enters., Inc.*,
317 F.3d 820 (8th Cir. 2003) .....................................................................6

*Lucas v. Enkvetchakul*,
812 S.W.2d 256 (Mo. App. S.D. 1991) ...................................................22

*Martin v. Wm. Wrigley Jr. Co.*,
2017 WL 4797530 (W.D. Mo. Oct. 24, 2017).....................................13, 19

*Schoenlein v. Routt Homes, Inc.*,
260 S.W.2d 852 (Mo. App. E.D. 2008) ...................................................21

*Sperling v. Stein Mart, Inc.*,
    2016 WL 8925347 (C.D. Cal. Jan. 26, 2016) ...........................................................................18

**STATUTES**

815 ILCS 505/1 *et* seq...................................................................................................................20

Mo. Rev. Stat. § 407.020 ...............................................................................................................13

Mo. Rev. Stat. § 407.020.1 ............................................................................................................14

Mo. Rev. Stat. § 407.025 ...............................................................................................................13

N.Y. Gen. Bus. Law § 391-q (McKinney 2011)............................................................................16

**OTHER AUTHORITIES**

39 C.F.R. § 3.3030 (2003) .............................................................................................................22

# I.  INTRODUCTION

Menards now understands why Ravencamp's original complaint was bereft of any details concerning Menards' alleged misrepresentations.  When Ravencamp is required to provide the who, what, when, where, why and how of his MMPA claim, one inescapable conclusion emerges:  He has no viable claim against Menards.

The centerpiece of Ravencamp's original claim was that Menards' print advertisements or flyers for its 11% rebate sale were deceptive because they displayed items with a "Final Price," which, according to Ravencamp, suggested that a customer would get an 11% discount off the sale price at the time of purchase.  *See* Doc. 1-1 at ¶¶ 15-23, Doc. 7 at 9-15.  Ravencamp claimed that Menards failed to disclose that its 11% rebate was, in fact, a mail-in rebate in the form of store credit on future purchases and that the process for obtaining such rebate was confusing.  *Id.*

Menards moved to dismiss Ravencamp's MMPA claim pursuant to Rule 9(b), because he did not allege with particularity the circumstances of Menards' purported deception.  The Court granted Menards' motion, concluding, among other things, that Ravencamp needed to plead facts demonstrating that he suffered an ascertainable loss because of Menards' alleged conduct:

> Plaintiff is required to allege facts demonstrating that he suffered damage or an ascertainable loss as a result of Defendant's alleged misconduct. *E.g., Murphy v. Stonewall Kitchen, LLC,* 503 S.W.3d 308, 313 (Mo. Ct. App. 2016); *Plubell,* 289 S.W.3d at 715. Given that Plaintiff's damage (if any) arose from a misrepresentation or deception, Rule 9(b) requires him to identify the misrepresentation or deception that damaged him. The only way for Plaintiff to have suffered damage from the deceptive advertising is if he saw or heard the deceptive advertising. Conversely, it is difficult to understand how Plaintiff 'suffer[ed] an ascertainable loss of money or property, real or personal, as a result of' Defendant's misrepresentations if he never saw or heard them. There is no authority that permits a consumer to bring suit for violations of the MMPA without explaining how those violations damaged the consumer bringing suit.

Doc. 19 at 6. The Court directed Ravencamp to file an amended complaint that "(1) specifies the advertisement(s) or other communication(s) he saw or heard, (2) alleges whether and how he applied for the rebate, (2) alleges whether he received a rebate, and (4) specifies what product(s) he purchased from, and the amount he paid to, Defendant." *Id*. at 7-8.

Pursuant to the Court's order, Ravencamp has now provided these details, which lay bare the baseless nature of his claim against Menards. While the focus of Ravencamp's prior complaint was that Menards' print advertisements deceived consumers and that Menards never properly disclosed that the rebate was a mail-in rebate in the form of a store credit, Ravencamp's amended complaint now reveals the following:

- Ravencamp never saw the print advertisements or flyers – that allegedly suggest that the "Final Price" includes an 11% discount at the time of purchase – before he made his purchases. Doc. 21 at ¶ 39.

- Ravencamp only saw the store signs that said "11% Rebate On Everything*" and "11% Off Everything Get an 11% Mail-In Rebate On ALL Your Purchases*," each of which advised consumers to "*See Flyer For Details," which Ravencamp admittedly did not do. *Id*. at ¶¶ 14-16, 34.

- Ravencamp purchased products from Menards on May 14, 2017 and May 16, 2017, during an 11% rebate sale. *Id*. at ¶ 23.

- Ravencamp paid for his purchases on May 14, 2017, in part, with a merchandise credit check that he received from a prior 11% rebate sale. *See* Decl. of Michael Every dated May 9, 2018 (Ex. 1) at ¶ 3; *see also* Exhibit C to the Every Decl.

- Ravencamp mailed the rebate receipts and rebate forms for his purchases on May 14 and May 16, 2017 to Menards, pursuant to Menards' instructions. Doc. 21 at ¶ 27.

- Ravencamp received a merchandise credit check from Menards for his purchases on those dates, which he redeemed – in full – on a later purchase. *Id*. at ¶ 28.

Simply put, Ravencamp's Amended Complaint establishes that Ravencamp fully understood the terms of Menards' 11% rebate sale when he made his purchases and willingly

chose to participate in that sale by mailing in his rebate form, obtaining a merchandise credit check, and redeeming it. Ravencamp was not deceived and suffered no ascertainable loss as a result of any alleged misrepresentation or deceptive statement by Menards. No further pleading can change this cold, hard fact.

In its motion to dismiss Ravencamp's original complaint, Menards questioned whether, in light of his history as a named plaintiff in three other MMPA class actions, Ravencamp was either the most deceived man in Missouri or knew exactly what he was doing when he made his purchases at Menards during its 11% rebate sale. Now, Menards and the Court have the answer. Ravencamp's Amended Complaint should be dismissed with prejudice

## II.    FACTS

### A.    Menards and Its 11% Rebate Sale

Menards is a private, family-owned Wisconsin corporation, operating approximately 300 home improvement stores primarily in the Midwest, including Missouri. Doc. 21 at ¶¶ 7, 11. Menards is regarded in the home improvement industry as the low price leader, and takes great pride in its famous slogan Save BIG Money®! *Id*. at ¶¶ 11-12. Menard customers are able to do so, not only through Menards everyday low prices, but also through regular sales and promotions.

Among Menards' most popular promotions are its rebate sales – including its 11% rebate sale – which it has held regularly for years. Doc. 21 at ¶¶ 11-12. As set forth in Menards' printed weekly ads/flyers, on-line advertisements, in-store signage, rebate receipts, and instructions, through this promotion participating customers can obtain an 11% mail-in rebate, on virtually all purchases made during an 11% sale, in the form of a store credit on future purchases from Menards. *See infra* at 4-12. The Federal Trade Commission page on "Rebates," which Ravencamp references in his complaint (*see* Doc. 21 at ¶ 29), explains that this is the typical way

that rebates operate: "most rebates are of the mail-in variety" and "require consumers to pay the full cost of an item at the time of purchase, then to send documentation to the manufacturer or retailer to receive a rebate by mail." *See* www.consumer.ftc.gov/articles/0096-rebates. Indeed, because of the frequency of Menards' 11% rebate sales and the full and complete disclosure of all terms and conditions, the customer redemption rate for all 11% rebate sales over the past five years is approximately 68.2%, across all stores. *See* Doc. 1 at ¶ 2.

## B. Menards' Store Signs

Ravencamp alleges that he made purchases from Menards on May 14 and May 16, 2017, during an 11% rebate sale. Doc. 21 at ¶¶ 23, 25-26. While Ravencamp continues to allege that Menards store signage, print, internet, and television advertisements are all false and deceptive (*id.* at ¶¶ 13-20, 31, 33), Ravencamp now concedes that the ***only*** advertisements he saw before making his purchases were the store signs and banners (*see id.* at ¶ 24), six of which, like the following, state "11% Rebate On Everything* *See Flyer For Details":



4

*Id*. at ¶¶ 14-16, 24.  Among these signs was the following, which provided that the 11% rebate was a mail-in rebate and, like the other signs, contained an asterisk directing consumers to "*See Flyer For Details":



*Id*. at ¶¶ 16, 34; see also Exhibit A to the Every Decl.

Ravencamp, however, does not allege that he saw any flyer or read its contents.  To the contrary, while Ravencamp continues to allege that the "Final Price" in Menard's printed flyers deceptively suggested that a consumer would receive an 11% discount off the purchase price at the time of purchase (*see* Doc. 21 at ¶¶ 19-20; Doc. 1 at ¶¶ 15-17), he fully admits that he "did not review the flyer before making his purchases."  Doc. 21 at ¶ 39.  In addition, he did not see any television ads or view any internet ads.  *Id*. at ¶ 24.

Instead, Ravencamp's claim is based on one thing:  Menards' signs.  And Ravencamp alleges that these signs are deceptive because the term "rebate" can **only** mean an immediate discount at the point of sale or a cash reimbursement shortly thereafter.  Doc. 21 at ¶¶ 30-31.

### C.   Menards' Flyers and the Terms of The 11% Rebate Sale

Had Ravencamp reviewed the flyer for the 11% rebate sale held during the period May 14 - May 20, 2017, a true and correct copy of which is attached as Exhibit B to the Every Decl.[1], he would have seen – on both the front page and inside back cover – the terms of the sale, including that it was a mail-in rebate in the form of a merchandise credit check valid in-store only:

 Mail-in-Rebate.  Rebate is in form of merchandise credit check, valid in-store only.  Merchandise credit check is not valid towards purchases made on MENARDS.COM®.  Limited to stock on hand.  No sorry slips.  First come, first served.  Future sale price adjustments, exchanges and merchandise returns will void the 11% rebate on the items adjusted, exchanged and/or returned.  Rebate is valid on special ordered products but does not extend to the special ordering of any normally stocked items.  Not good with any other coupons or offers except Menards® coupons, Menards rebates and manufacturers' coupons.  Multiple receipts may accompany one rebate certificate.  Menards reserves the right to limit purchases of any and all items to reasonable job lot quantities.

**Excludes event tickets, gift cards, propane purchases, delivery and handling charges, all rental items, minuteKEY®, processing fees, packaging charges and extended service agreements**.

---

[1] Under the incorporation-by-reference doctrine, a court may consider, in deciding a Rule 12 motion, any documents "necessarily embraced by the pleadings," including those "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012); *Enervations, Inc. v. Minn. Mining & Mfg. Co.,* 380 F.3d 1066, 1069 (8th Cir.2004); *Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 831 (8th Cir. 2003); *Hughes v. 3M Retiree Medical Plan,* 281 F.3d 786, 790 (8th Cir. 2002).  Thus, "if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment.  The doctrine prevents a plaintiff from 'evad[ing] dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that prove[s] his claim has no merit.'" *Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687, 690 (7th Cir. 2012).

Every Decl., Ex. B at 1, 5.  Every reference to the "11% REBATE\*" after every specific item in this flyer is followed by an asterisk which refers to the terms set forth above.  *Id*.  In total, there are 162 references to the terms of the "11% REBATE" in this flyer.  *Id*.

Even though he never saw these disclosures, Ravencamp takes issue with them.  He alleges that these terms are set out in "fine print" and the flyers are "not readily accessible to consumers."  *See* Doc. 21, Am. Compl. at ¶¶ 34, 42.  Ravencamp admits that a rack holding the flyers in the Independence, Missouri store was located just inside the entrance as a consumer begins to shop at Menards.  Nevertheless, Ravencamp claims that consumers are not "otherwise advised to review the flyer before beginning to shop."  *Id*. at ¶ 37.b.  Ravencamp goes on to allege that once a consumer enters the store, through a turnstile, there is an "impression" that there is no going back to get a flyer, even if a consumer later saw the reference in the signs directing him/her to "\*See Flyer For Details."  *Id*. at ¶ 37.c-d.  According to Ravencamp, this "effectively eliminates the flyer as a source of information for consumers."  *Id*. at ¶ 37.d.

Apparently, then, it is Ravencamp's new position that Menards effectively hid the flyers by which it supposedly was trying to deceive consumers.  That is an odd contention on which to base a claim of deception.  Nevertheless, if, as Ravencamp contends, the flyers are eliminated "as a source of information for consumers," then they must be eliminated from his Amended Complaint (*see* Doc. 21 at ¶¶ 18-20) as a source of deception.  He cannot have it both ways.

In addition, Ravencamp's "impression" that he could not go back and get a flyer, while implausible, does not explain why, having purchased items at Menards on May 14, 2017, he did not pick up a flyer when he entered the store two days later on May 16, 2017, to make additional purchases.  In any event, accepting Ravencamp's allegations as true, the flyers were located inside the entrance when he entered the store, but he did not pick one up.  Doc. 21 at ¶ 37.b.  He

then went inside the store and saw the signs that said "11 % Rebate On Everything*" and "*See Flyers for Details" (*id.* at ¶ 24), but Ravencamp chose not to go back for a flyer for those details on May 14, 2017 and did not pick up a flyer when he entered the store on May 16, 2017.

**D.  Ravencamp Knew The Terms of the 11% Rebate Sale When He Made His Purchases on May 14, 2017, Because He Paid For His Purchases With a Merchandise Credit Check from a Prior 11% Rebate Sale**

Whether or not Ravencamp chose to ignore the flyers, his Amended Complaint reveals that he was, nonetheless, well aware of the details and terms of Menards' 11% rebate sale before he saw any of the allegedly deceptive signs when he walked into Menards' Independence, Missouri store on May 14, 2017.

In response to this Court's order, Ravencamp has now been forced to provide the details surrounding his purchase at Menards. With respect to the first purchase on May 14, 2017, Ravencamp alleges that he was not able to locate the sales receipt, but attached the rebate receipt for that purchase. Doc. 21 at ¶ 25; Doc. 21-1. With this information, however, Menards was able to reprint the sales receipt, which was originally printed with this rebate receipt on May 14, 2017.[2] A copy of this sales receipt is attached as Exhibit C to the Every Decl. and is incorporated by reference.

As Ravencamp assumed based on the total rebate amount reflected in the rebate receipt (*see* Doc. 21, Am. Compl. at ¶ 25), the sales receipt shows total purchases on May 14, 2017 of $45.55, consisting of four items:  clear packaging tape ($7.79), two packages of bubble wrap ($33.78), and 14" x 18" create a sign ($3.98). Every Decl. at ¶ 4; Every Decl. Ex. C. Based on these purchases, Ravencamp received a rebate receipt for $5.01 or 11% of $45.55. Doc 21-1; Every Decl. Ex. C.

---

[2] Ravencamp used the same process to reprint his sales receipt for his purchase on May 16, 2017. *See* Doc. 21 at ¶ 26.

The sales receipt, however, shows one more thing. ***Ravencamp paid for his purchase at Menards on May 14, 2017, with a "MENARD REBATE" check in the amount of $14.36***, and a Visa card for the balance. *See* Every Decl. at ¶ 4; Every Decl. Ex. C. The wording "MENARD REBATE 31-1@$14,36" in the reprinted sales receipt refers to a Menards' Merchandise Credit Check issued from a prior 11% rebate sale. *Id.* Thus, Ravencamp's own complaint establishes Menards' store signs did not cause Ravencamp any ascertainable loss. Ravencamp knew and fully understood the terms and conditions of Menard's 11% rebate sale when he walked into the Menards Independence, Missouri store on May 14, 2017, to make his purchase. *See infra* at 19-20.

**E.** **After Ravencamp Made His Purchases in May 2017, He Mailed in the Rebate Forms and Rebate Receipts, Obtained a Store Credit and Redeemed It**

Not only did Ravencamp use a rebate check to make the first May 14th purchase alleged in his Amended Complaint, but Ravencamp also concedes that he mailed the rebate forms for this and his later May 16, 2017 purchase. Doc. 21 at ¶ 27. In addition, Ravencamp asserts that he later received a merchandise credit check from Menards, which he redeemed on other purchases. *Id.* at ¶ 28. Although Ravencamp claims that the process for obtaining the rebates is confusing and part of Menards' deception (*see id* at ¶¶ 46-49), his own complaint shows that he understood and had no trouble with the process.

Moreover, Ravencamp fails to attach any of the instructions or forms that he viewed and filled out to obtain his rebate. A review of the rebate receipts, instructions and forms, which are also part of the Amended Complaint by reference, however, demonstrates that the process was simple and straightforward and that Ravencamp was again advised that the rebate was a mail-in rebate in the form of store credit from Menards.

As Ravencamp admits, to obtain the 11% rebate, a customer need only mail in to Menards his/her rebate receipt along with a rebate form. Doc. 21 at ¶ 46. As indicated, during the 11% rebate sale, a rebate receipt is printed along with a customer's sales receipt. *Id*.; *see also* Doc. 21-1. The rebate receipt (1) sets forth the amount of the 11% rebate ($5.01); (2) identifies the date by which the customer must mail it in to obtain the rebate (6/10/17); and (3) states that "[t]o obtain rebate form, pickup at Rebate Center in store, or go to www.menards.com and download as needed":



Doc. 21-1.

Attached to the Every Decl. as Ex. D is a true and correct copy of the rebate form and instructions that correspond to the 11% rebate sale held on May 14–May 20, 2017, which Ravencamp admittedly filled out. Doc. 21 at ¶ 27; Every Decl. at ¶ 5. The rebate form is a

single document with two halves, available in Menard stores or on-line.[3]  *See* Every Decl. Ex. D. One half contains the instructions for filling out and mailing the form and rebate receipt, while the other half, to be folded, separated, and mailed with the rebate receipt, contains boxes for the customer to put in his/her name and address.  *Id.*  The instructions provide, among other things, that (1) the mail-in rebate "is in the form of a merchandise credit check," (2) a "Menards® Merchandise Credit Check [is] valid towards future purchases at any Menards® retail store", (3) the rebate form with rebate receipt must be postmarked by the date specified, and (4) it may take 6-8 weeks to process the form an rebate receipt:

---

[3]  The on-line form and instructions can be found at https://www.menards.com/main/rebates/c-13180.htm



**Rebate #0417**
**5/14/17 - 5/20/17***

Menards® Merchandise Credit Check valid towards future purchases at any
Menards® retail store and not valid for purchases on MENARDS.COM®

**MENARDS** ®

**Mail rebate certificate and ORIGINAL rebate receipt(s) to:**

**Save 11%**

**PO BOX: 155**
**Elk Mound, WI 54739-0155**

**3 simple steps to receive your rebate:**
  1. Fill out your name and address on this certificate.
  2. Enclose the original Menards® "Rebate Receipt(s)" and this
     completed certificate in an envelope.
  3. Mail the envelope to the address above.

*Rebate is in form of merchandise credit check. Excludes gift cards, propane purchases,
delivery and handling charges, all rental items, minute key purchases, processing fees,
packaging charges, and extended service agreements. Limited to stock on hand. No rain
checks. First come, first served. Future sale price adjustments, exchanges and merchandise
returns will void the 11% rebate on the items adjusted, exchanged and/or returned. Rebate is
valid on special ordered products but does not extend to the special ordering of any normally
stocked items. Not good with any other coupons or offers except Menards® coupons,
Menards® rebates and manufacturers' coupons. Multiple rebate receipts may accompany
one rebate certificate. Menards® reserves the right to limit purchases of any and all items
to reasonable job lot quantities.

**Rebate must be postmarked by 6/10/17**

**Please note:**
• A copied receipt will not be accepted.
• Allow 6-8 weeks for processing.
• Rebates are limited to stock on hand, no rainchecks.
• One certificate can be used for multiple rebate receipts.
• Arrangements must be made for immediate pick up or delivery.
• Check the status of your rebate at www.rebateinternational.com
• Please print clearly, we are not responsible for lost or misdirected
  mail due to lack of print clarity.

WARNING: Fraudulent submissions can result in federal prosecution for mail fraud under the 18 USC Sections
1341 & 1342. Menards reserves the right to deny rebate claims. Void where prohibited. No need to fold, staple,
tape, or paperclip, which delays processing. Contents donot leave envelope until entered for payment.

**N0417N**

Fold Here

*Id.*

Again, as explained above, none of this was confusing to Ravencamp. He admits that he followed these instructions, received a merchandise credit check, and redeemed it on later purchases at Menards. Doc. 21 at ¶ 28.

## III.    ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must allege facts sufficient to make the claim of unlawful conduct "plausible." *Id*. at 555-56. In making that determination, neither factual nor legal conclusions are enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009) ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.")

Rather, only "well-pleaded factual allegations" may be credited in determining whether a complaint "plausibly give[s] rise to an entitlement to relief." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Id., citing* Fed. R. Civ. P. 8(a)(2). In *Martin v. Wm. Wrigley Jr. Co*., No. 4:17-cv-00541, 2017 WL 4797530, at *5 (W.D. Mo. Oct. 24, 2017), the court applied this standard to a claim under the MMPA.

As set forth above, Ravencamp claims that Menards misrepresented its 11% rebate sale in violation of the MMPA. Doc. 21 at ¶ 64. To state a claim under the MMPA, Ravencamp must allege that he: (1) leased or purchased a product or service; (2) primarily for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful by Mo. Rev. Stat. § 407.020. Mo. Rev. Stat. § 407.025; *Hess v. Chase Manhattan Bank, USA, N.A.,* 220 S.W.3d 758, 773 (Mo. 2007) (*en banc*). Among the acts declared unlawful by Mo. Rev. Stat. § 407.020 is the use or employment of "deception, fraud, false pretense, false promise, misrepresentation, unfair practice, concealment, suppression, or

omission in connection with the purchase of the product or service at issue."  Mo. Rev. Stat. §

407.020.1; *Chochorowski v. Home Depot U.S.A., Inc.* 295 S.W.3d 194, 198 (Mo. Ct. App. 2009).

When the Court views Ravencamp's allegations in their entirety, including,  pursuant to

the incorporation by reference doctrine (*see supra* at 6, n.1), those documents that Ravencamp

references but fails to attach to his complaint, they do not plausibly allege a claim for relief.  As

the Court previously held, Ravencamp could not have suffered an ascertainable loss as a result of

Menards' alleged misrepresentations if he never saw or heard them.  Doc. 19 at 6.  While

Ravencamp continues to broadly claim that Menards signs, printed flyers, television and internet

advertisements were all misleading and deceptive (*see* Doc., 21 at ¶¶ 17-20, 33, 40-45), he now

admits that the only advertisements he saw, before making any purchase, were the store signs.

*Id*. at ¶¶ 13-16.  Six of these signs read "11% Rebate On Everything*"; one provides "11% Off

Everything Get an 11% Mail-In Rebate On ALL Your Purchases*."  *Id*. at ¶¶ 13-16.  Ravencamp

also acknowledges that each of the signs has an asterisk advising consumers to "*See Flyer For

Details."  *Id*. at ¶ 34.

In light of these allegations, the only advertisements that can form the basis of

Ravencamp's claims are the store signs.[4]  Thus, the relevant question for purposes of this motion

is whether Ravencamp suffered an ascertainable loss as a result of any false or deceptive

statement contained in these signs.   The Court should dismiss Ravencamp's Amended

Complaint, pursuant to Rule 12(b)(6), for any one of the following three reasons:

---

[4] Thus, the Court should disregard all of Ravencamp's allegations (*see* Doc., 21 at ¶¶ 17-20, 33, 40-45)
that Menards' printed flyers and television and internet advertisements were false, misleading and
deceptive, since he never saw or heard any of them.  *Id*. at ¶ 24.  Just as Ravencamp alleges that the flyers
must be eliminated "as a source of information for consumers" (*id*. at ¶ 37.e.), they also must be
eliminated as a source of deception from Ravencamp's claim.

First, the signs are not deceptive because, contrary to Ravencamp's assertion, none state that a consumer will get an 11% discount off the purchase price or an 11% cash reimbursement, and they each reference the flyer which makes clear that the rebate is a mail-in rebate in the form of a store credit.

Second, Ravencamp knew that Menards' 11% rebate sale was a mail-in rebate in the form of a store credit when he walked into Menard's Independence store in May 2017 and saw the store signs, because he paid for his purchase, at least in part, with a merchandise credit check from a prior 11% rebate sale.

Third, Ravencamp suffered no ascertainable loss from Menards allegedly deceptive signs, because he applied for, obtained and redeemed an 11% Menards' merchandise credit check on his purchases.

## A.     Menards' Signs Are Not Deceptive

Ravencamp alleges that Menards store signs are deceptive because they supposedly "create the impression that the 'rebate' under the 11% Rebate Program is offered in the form of cash or rebate check to effectively reduce the price of a product that was purchased to earn the rebate."  Doc. 21 at ¶ 31.  Nowhere do any of the signs alleged in the amended complaint, however, state that a consumer will receive a "cash rebate," whether in the form of an immediate discount or later cash reimbursement.  Rather, they make clear that the rebate is a mail-in rebate and reference the flyer for details, which informs customers that the rebate is in the form of a store credit on future purchases.

Ravencamp's contrary contention that these signs are deceptive turns entirely on his allegation that the term "rebate" in this context can only mean one thing:  "an immediate discount at the point of sale or through cash reimbursement in the near future."  Doc. 21 at ¶ 30.

This, however, is not a fact, but a legal conclusion not supported by the law or Ravencamp's own allegations.

Indeed, Ravencamp's conclusion confuses, perhaps deliberately, rebates and discounts. Discounts are immediate reductions in price offered to consumers at the time of purchase. http://www.businessdictionary.com/definition/sales-discount.html. A rebate, on the other hand, is a delayed incentive that requires consumers to make a purchase at the sale price, submit a request for a rebate amount, and wait for some period to obtain the rebate, whether in the form of cash or credit. The following statutory definition from New York is instructive:

> . . . the term 'rebate' shall mean an offer to provide cash, credit, or credit towards future purchases, that is offered to consumers who acquire or purchase a specified product or service and that is conditioned upon the customer submitting a request for redemption after satisfying the terms and conditions of the offer. The term shall not include any discount from the purchase price that is taken at the time of purchase, any discount, cash, credit, or credit towards a future purchase that is automatically provided to a consumer without the need to submit a request for redemption, or any refund that may be given to a consumer in accordance with a company's return, guarantee, adjustment, or warranty policies, or any company's frequent shopper customer reward program.

N.Y. Gen. Bus. Law § 391-q (McKinney 2011).

That a rebate is not an immediate discount at the time of sale is also demonstrated by the FTC page on "Rebates" from January 2000, cited by Ravencamp (*see* Doc. 21 at ¶ 29), which points out that most rebates are of the mail-in variety:

> Some manufacturers and retailers entice shoppers with instant cash rebates that can be redeemed immediately at the checkout counter.

> But most rebates are of the mail-in variety. They require consumers to pay the full cost of an item at the time purchase, then to send documentation to the manufacturer or retailer to receive a rebate by mail.

*See* www.consumer.ftc.gov/articles/0096-rebates.

Ravencamp cites no Missouri case or any other authority adopting his personal definition of a rebate. To the contrary, Ravencamp alleges that the term rebate can have multiple definitions, including "an amount of money that is paid back when someone overpays," "a return of part of a payment," or "an amount paid by way of reduction, return or refund." Doc. 21 at ¶ 30. None of these definitions, however, exclude a rebate in the form of a store credit. Nor are we aware of any authority that holds that a rebate can only mean "an immediate discount at the point of sale or through cash reimbursement in the near future." *Id.*

Ravencamp's contention that his definition of rebate is plausible and, hence, his complaint states a claim, misunderstands *Twombly*. The relevant question is not whether Ravencamp's personal definition of rebate is plausible. The question is whether Ravencamp's claim that Menards' signs were deceptive, based on this admittedly ambiguous term, is plausible.

For such claim to be plausible, Ravencamp's personal definition of the term rebate would have to be the ***only*** one the term could have. As Ravencamp's amended complaint reveals, however, it is not. Given that the term rebate can mean many things and has many applications, Ravencamp's claim that every consumer had to believe that Menards' 11% rebate was a cash discount at the time of purchase is simply not plausible. *See Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 761-62 (W.D. Mo. 2015) (dismissing a claim under the MMPA where the complaint offered no plausible or applicable definition of "natural" which the court found was vague and ambiguous.) Indeed, even Ravencamp did not believe the 11% rebate sale provided a discount at the time of purchase or a cash reimbursement shortly thereafter. *See infra* at 19-20.

And, Ravencamp's claim is rendered even more implausible by the signs themselves, which in each instance reference the flyer for details. As indicated, those flyers set forth the terms of the 11% rebate sale, including that the rebate is a mail-in rebate in the form of a store

credit. *See supra* at 6-8. These terms are not hidden in "fine print." Rather, they are set out on both the front and inside back cover and every product description contains an asterisk referring to those terms, in total 162 times. *See* Every Decl. Ex. B.

Ravencamp's contention that the flyers, which he concedes were set out on a rack when he first entered the store, were somehow inaccessible is equally implausible. The fact remains that Ravencamp saw the signs, all of which contained an asterisk which said "*See Flyer For Details," and made no effort to get or review the flyer before making his purchase. Contrary to Ravencamp's argument, a reasonable consumer cannot simply ignore an asterisk referring him/her to the terms of a sale:

> Plaintiff alleges that "[n]owhere on Defendant's price tags, or in Defendants' [sic] price advertising, is it made clear to consumers, including Plaintiff, that the advertised 'Compare At' price is merely what Defendant believes to be the 'original price' or 'suggested retail price' of a 'comparable item.' " (SAC ¶ 56; *see also* SAC ¶¶ 62–65.) Defendant's price tags, however, have an asterisk next to the phrase "Compare At." (*See* Def.'s RJN, Ex. H.) The asterisk states "See Stein Mart's Fair Pricing Policy at Steinmart.com or in store." (*Id.*) Thus, Plaintiff's description of the "Compare At" phrase as "unqualified" is implausible. Plaintiff's SAC fails to address the asterisk on Defendant's price tags, which directs consumers to Defendant's Fair Pricing Policy. (*See id.*) Moreover, the Ninth Circuit has rejected a plaintiff's attempt to argue that a reasonable consumer would "ignore the qualifying language in small print." *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995); *see also id.* at 290 ("[W]hen read reasonably and in context, the promotion makes no such false representation.").

*Sperling v. Stein Mart, Inc.*, 2016 WL 8925347, at *8-9 (C.D. Cal. Jan. 26, 2016).

In sum, Ravencamp's claim is implausible because it requires the Court to (i) accept his legal conclusion that the term "rebate" can only mean a cash discount at or near the time of purchase, and (ii) ignore the terms of Menards' 11% rebate sale, which make clear that such rebate is in the form of an in-store credit on future purchases. There is no basis for the Court to do so, and Ravencamp's complaint should be dismissed. *See Martin v. Wm. Wrigley Jr.. Co.*, 2017 WL 4797530, at *5 (W.D. Mo. Oct. 24, 2017).

### B. Ravencamp Knew The Terms of Menards' 11% Rebate Sale When He Made His Purchases in May 2017

Not only does Ravencamp fail to allege any facts demonstrating that Menards' signs were deceptive, but Ravencamp could not have suffered an ascertainable loss as a result of the signs for the simple reason that he knew the terms of Menards 11% rebate sale when he saw them.

As set forth above, Ravencamp alleges that Menards signs concerning the 11% rebate sale were deceptive because they supposedly created the "impression," by using the term "rebate*," that he would get an immediate discount at the point of sale or through cash reimbursement in the near future. But Ravencamp already knew that Menards 11% rebate was a mail-in rebate in the form of a merchandise credit check[5] when he made the first purchase alleged in the complaint. We know this because he paid for the purchases made on May 14, 2017, in part, with a Menards merchandise credit check from a prior 11% rebate sale. *See supra* at 8-9. So, he could not have suffered an ascertainable loss because of any supposed misrepresentation in those signs.

In a case involving both the MMPA and Illinois' equivalent law, the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et* seq., the Seventh Circuit affirmed, just one month ago, the dismissal of a claim for deceptive practices on the ground that those who know the truth do not have a valid claim. *Haywood v. Massage Envy*

---

[5] Ravencamp also alleges that the term "merchandise credit check" is misleading because the use of the word "check" "connotes a negotiable instrument that can be cashed or deposited at a bank." Doc. 21 at ¶ 42. This contention is also implausible. Under Ravencamp's logic, a "rain check," "coat check," or "bag check" would each connote a negotiable instrument since they also use the word "check." No one, however, would draw this conclusion because of the context and adjectives used to describe the type of check. In this case, Menards used the term "merchandise credit check," not "personal check," "bank check," "cashier's check," or "certified check," which actually connote a negotiable instrument. In addition, Ravencamp plainly understood that Menards' merchandise credit check was a store credit on future purchases, since he paid for his purchase on May 14, 2017, with a merchandise credit check from a prior 11% rebate sale. Indeed, the instructions that Ravencamp used to obtain this merchandise credit check provided that "Menards® Merchandise Credit Check [is] valid towards future purchases at any Menards® retail store." *See supra* at 11-12.

*Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018). In *Haywood*, plaintiff claimed that defendant's advertisement for a one-hour massage was false and misleading because her massage only lasted 50 minutes. The Seventh Circuit rejected her ICFA claim for relief on the second visit for the following reason:

> As an initial matter, Haywood cannot obtain relief based on her second visit to Massage Envy because after her first visit, she cannot plausibly allege that she was deceived regarding the length of the massage. In fact, she states in the complaint that she booked the second massage "to verify that Massage Envy provided only 50-minutes' massage time." Because she knew how long the massage would last, she cannot maintain a claim based on the second visit. *Oliviera v. Amoco Oil Co.,* 776 N.E.2d 151, 164 (Ill. 2002) (holding that those who "know the truth" do not have a valid ICFA claim).

*Id*. at 333.

Inasmuch as the Seventh Circuit recognized that the MMPA and the ICFA were materially similar, as both provide a private right of action for those who suffer a loss as a result of deceptive advertising (*see Hayward*, 887 F.3d at 333-34, 336), the court's logic applies with equal force to the MMPA and this case. Here, Ravencamp knew the truth before he made his purchases in May 2017. At that time, he fully understood that Menards' 11% rebate sale was mail-in rebate in the form of a store credit, as evidenced by his use of a merchandise credit check from a prior 11% rebate sale to make his purchase. As a consequence, Ravencamp could not have suffered an ascertainable loss as a result of any supposedly misleading store signs on May 14 or May 16, 2017.

## C.    Ravencamp Suffered No Ascertainable Loss

Finally, Ravencamp's Amended Complaint establishes, once and for all, that he has suffered no ascertainable loss.

Ravencamp alleges that a "store credit coupon is less useful and valuable to consumers than cash or rebate check because the coupon is non-transferrable and can only be used for future

purchases at Menards stores." Doc. 21 at ¶ 43. Thus, according to Ravencamp, "[a]ll consumers who purchased items under the 11% Rebate Program were also deprived of the benefit of the advertised bargain because the full value of the promised rebate could never be realized." *Id*. at ¶ 53.

To determine whether a plaintiff has suffered an "ascertainable loss" under the benefit of the bargain rule, a court must compare the actual value of the item to the value of the item if it had been as represented at the time of the transaction. *See Schoenlein v. Routt Homes, Inc*., 260 S.W.2d 852, 854 (Mo. App. E.D. 2008). Putting aside that Menards signs were not deceptive (*see supra* at 15-18), Ravencamp's allegation would only be true, however, if Menards barred a consumer from ever shopping at Menards again and redeeming the store credit on a future purchase. Unless Menards did so, the consumer would suffer no loss. If the consumer chose not to shop at Menards or chose not to redeem his store credit, that would be the consumer's choice, not the result of any misconduct by Menards. And if a consumer did shop and use the store credit to reduce the amount spent on future purchases, the value of the item received – a store credit – would be worth the same as a cash rebate. *See Grawitch v. Charter Commc'ns, Inc.*, 750 F.3d 956, 960 (8th Cir. 2014) (dismissing MMPA claim under Rule 12(b)(6) because the plaintiff could not show that the value of the service received was less than what was paid for by the plaintiff).

And therein lies Ravencamp's problem. While he alleges that no consumer could ever realize the benefit of the bargain as supposedly misrepresented, Ravencamp fully realized that benefit precisely because he not only followed Menards' instructions, by mailing in the rebate receipts and forms, but obtained the store credit and used it on subsequent purchases. Doc. 21 at

¶ 28.  Under these circumstances, he has no ascertainable loss, because the store credit was just as valuable as cash.

Ravencamp's only response is that Menards' advertisements are false and misleading because they do not disclose that a consumer must incur the cost of postage, which according to Ravencamp, reduces the net value of the rebate to less than 11% of the purchase price, by the amount of such postage.  Doc. 21 at ¶¶ 32, 53.  This contention is baseless.

The power of the United States Postal Service to establish and charge postage is established by law.  39 C.F.R. § 3.3030 (2003).  It is well settled that everyone is presumed to know the law, and a claim of fraud or deception cannot be based on an alleged misrepresentation of the law.  *Lucas v. Enkvetchakul*, 812 S.W.2d 256, 260 (Mo. App. S.D. 1991).  Thus, Ravencamp is legally presumed to know that he would have to pay postage for the rebate.  And nowhere in the signs that Ravencamp claims are deceptive did Menards ever represent that it would pay for the postage for the mail-in rebate.   Indeed, when Ravencamp made his purchases on May 14, 2017, he knew that the he had to pay the postage, since he had previously done so to obtain the merchandise credit check that he used that day.

## CONCLUSION

For the forgoing reasons, Menards respectfully requests that the Court dismiss Ravencamp's complaint pursuant to Federal Rules of Civil Procedure 12(b)(6).

Dated this 10th day of May, 2018

Respectfully submitted,

SPENCER FANE LLP

By: /s/ Thomas Hiatt_____
Bryant T. Lamer, Mo. 57355
Thomas Hiatt, Mo. 68134
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64106

Tel.   (816) 474-8100
Fax    (816) 474-3216
blamer@spencerfane.com
thiatt@spencerfane.com

FREEBORN & PETERS LLP

Brian P. Norton,
James J. Boland,
Andrew C. Nordahl
311 South Wacker Dr., Suite 3000
Chicago, Ill. 60606
Tel.    (312) 360-6000
FAX    (312) 360-6520
bnorton@freeborn.com
jboland@freeborn.com
anordahl@freeborn.com

*Attorneys for Defendant Menard, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the United States District Court for the Western District of Missouri, this 10th day of May, 2018 with a true copy was also served electronically upon the following via the Court's ECF filing system:

Christopher S. Shank
David L. Heinemann
Stephen J. Moore
SHANK & MOORE, LLC
chris@shankmoore.com
davidh@shankmoore.com
sjm@shankmoore.com

*Attorneys for Plaintiff*

/s/ Thomas Hiatt
*Attorney for Defendant*